IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SHIYAN JIANG, | § | |
| Plaintiff, | § § § | |
| v. | § | 1:17-CV-739-RP |
| TEXAS COMMISSION ON ENVIRONMENTAL QUALITY and KIM WILSON, *individually and in her capacity as Director of Water Availability*, | § § § § § § | |
| Defendants. | § § | |

**ORDER**

Before the Court is a motion for summary judgment filed by Defendants Texas Commission on Environmental Quality ("TCEQ") and Kim Wilson ("Wilson"), individually and in her capacity as TCEQ's Director of Water Availability (together, "Defendants"). (Dkt. 16). Having considered the parties' arguments, the factual record, and the relevant law, the Court will deny Defendants' motion.

**I. BACKGROUND**

Plaintiff Shiyan Jiang ("Jiang") is a civil engineer who spent 23 years working for the Texas Commission on Environmental Quality ("TCEQ") as a hydrologist. (Jiang Decl., Dkt. 19-2, at 1–2). Jiang is 73 years old; he was born in China. (*Id.* at 1). In November 2014, Jiang filed an internal complaint that a supervisor had discriminated against him on the basis of his age and race. (*Id.* at 2). He alleges that he began to receive unjustified differential treatment after making that first complaint; he later filed a second internal complaint in August 2015. (*Id.* at 2–3).

In December 2015, Jiang's department director Kim Wilson ("Wilson") placed him on six-month disciplinary probation. (*Id.* at 3). According to Wilson, she placed Jiang on probation because he failed to follow policy directives from supervisors, reinitiated closed policy debates, and

conducted himself unprofessionally. (Dec. 3 Memo, Dkt. 16-2, at 194–196). While on probation, Jiang participated in two progress meetings: one on February 11, 2016, and another on April 21, 2016. (Jiang Decl., Dkt. 19-2, at 3). At the April 21 meeting, he again complained that he was being discriminated against on the basis of his age and race. (*Id.* at 4). On April 22, Jiang's team leader Christine Peters ("Peters") drafted a recommendation to fire him. (Mot. Summ. J., Dkt. 16, at 11). Wilson agreed with Peters' recommendation and issued a notice of intent to discharge to Jiang on April 29. (*Id.* at 12). After unsuccessfully appealing the decision to terminate his employment, Jiang was fired in June 2016. (*Id.*).

Jiang then filed this action against Defendants, alleging claims for: (1) discrimination on the basis of his race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Texas Commission on Human Rights Act ("TCHRA"); (2) retaliation for engaging in protected activities under Title VII and the TCHRA; and (3) a violation of 42 U.S.C. § 1981 by denying him "equal rights and benefits." (Orig. Pet., Dkt. 1-4, at 12–14).[1] Defendants now ask the Court to grant summary judgment against Jiang on each of his claims. (Mot. Summ. J., Dkt. 16).

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district

---

[1] Jiang also alleged claims for violations of his right to engage in protected speech under the United States Constitution and the Texas Constitution, (Orig. Pet., Dkt. 1-4, at 13–14), but he has dropped those claims, (Stipulation, Dkt. 17).

court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). Courts must view the summary judgment evidence in the light most favorable to the nonmovant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

### III. SUMMARY JUDGMENT EVIDENCE

Jiang began working for TCEQ in 1993. (Jiang Decl., Dkt. 19-2, at 1). According to Defendants, Jiang had a decade-long history of raising policy disagreements with management, such as disputing the correct criteria for evaluating stream-diversion applications. (Mot. Summ. J., Dkt. 16, at 4–6). Nonetheless, Jiang asserts without contradiction that he was not formally disciplined for any reason from 1993 until December 2015. (Jiang Decl., Dkt. 19-2, at 3). In fact, Jiang appears to have received satisfactory or better performance reviews until December 2015. (*Id.*).

In October 2014, Jiang's supervisor confronted him about placing certain papers in permit application folders. (Complaint Form, Dkt. 16-1, at 183–89). Jiang thought the encounter reflected race- and age-related bias, and he filed a discrimination complaint within a week. (*Id.*). The investigative report for that complaint was sent to the Action Review Committee ("ARC"), which included Human Resources Director Melissa Applegate ("Applegate") and Wilson. (Mot. Summ. J., Dkt. 16, at 7). The ARC met on June 29, 2015. (*Id.*). Wilson became head of the Surface Water

Availability Team ("SWAT") on July 1, 2015, making her part of the ARC that considered Jiang's complaint. (*Id.*; *see* Resp. Mot. Summ. J., Dkt. 19, at 8). The ARC dismissed Jiang's complaint on July 1, 2015. (July 1 Memo, Dkt. 16-1, at 190).

After Wilson became the SWAT director, four employees—half of SWAT—filed discrimination complaints based on age or race. (*See* Wilson Dep., Dkt. 16-2, at 17; Nov. 6 Memo, Dkt. 16-2, at 191). Within a month of reporting those discrimination complaints to human resources, Wilson placed two of those employees, including Jiang, on disciplinary probation. (*See* Resp. Mot. Summ. J., Dkt. 19, at 9).[2] Jiang's six-month disciplinary probation began on December 3, 2015. (Dec. 3 Memo, Dkt. 16-2, at 194).

TCEQ listed a number of bases for Jiang's probation. First, Jiang had not complied with a directive not to place draft documents in permit application folders. (*Id.*). Second, Jiang had taken too long to complete a project (the "Enterprise application"). (*Id.*). Third, Jiang reinitiated debates about policy matters already considered and decided by management. (*Id.*). Finally, Jiang raised his voice in meetings. (*Id.*).

Jiang filed a memo disputing the bases for his probation, (Jiang Rebuttal Memo, Dkt. 19-2, at 6–9), and he now produces evidence suggesting that those bases are pretextual, (Resp. Mot. Summ. J., Dkt. 19, at 9–11). According to one coworker, other SWAT employees kept draft documents in permit application folders while they worked on the application, but only Jiang was reprimanded for it. (Mughal Interview Notes, Dkt. 19-3, at 78). Jiang argues that he completed the Enterprise application as directed, (Jiang Rebuttal Memo, Dkt. 19-2, at 7–8), and that his supervisor had no issues with his memo, (Alexander Dep., Dkt. 16-3, at 92). Finally, Jiang's coworkers say that others use raised voices, (Peters Dep., Doc. 16-2, at 242–43; Mughal Dep., Doc. 16-3, at 497–98),

---

[2] The supervisor for a third of those four employees drafted a performance improvement plan for her within a month of Wilson's memo. (Buckley Draft PIP, Dkt. 19-3, at 57). That employee transferred out of SWAT before the plan could take effect. (*See* Resp. Mot. Summ. J., Dkt. 19, at 9).

4

but Wilson admits that she has not formally reprimanded anyone else for doing so, (Wilson Corp. Dep., Dkt. 16-3, at 135).

Jiang had two progress meetings while he was on probation. According to TCEQ's agenda for the first meeting in February 2016, Defendants told Jiang he had not complied with all of the requirements for probation, such as not reinitiating policy debates with his supervisors. (Feb. 11 Meeting Agenda, Dkt. 16-2, at 210). His second progress meeting took place on April 21, 2016. (Apr. 21 Meeting Agenda, Dkt. 16-2, at 213). According to TCEQ's agenda for that meeting, Defendants again told Jiang that he failed to comply with all of the requirements, including the policy-debate requirement. (*Id.* at 213–14). During the April 21 meeting, Jiang complained about race and age discrimination. (Jiang Decl., Dkt. 19-2, at 4). The meeting agenda indicates that Jiang was told that he "needs to demonstrate improvement" and that TCEQ was "hopeful that [Jiang's] attention to this matter will cause immediate correction." (Apr. 21 Meeting Agenda, Dkt. 16-2, at 217). The agenda says that Jiang's "failure to address" the concerns raised in the meeting "would result in further disciplinary action, including discharge." (*Id.*).

On the morning after Jiang's second progress meeting, Peters drafted a memo recommending that Jiang be fired. (Peters email, Dkt. 16-2, at 261; Peters Apr. 21 Memo, Dkt. 16-2, at 315). Peters admits that there were no incidents between the second meeting and her discharge recommendation. (Peters Dep., Dkt. 16-2, at 251). On April 28, Peters and another supervisor, Lori Hamilton, issued a formal recommendation to Wilson recommending Jiang's termination. (Hamilton and Peters Apr. 28 Memo, Dkt. 16-2, at 391).

In their recommendation, Peters and Hamilton cite Jiang's failure to comply with TCEQ's internal policy on professional conduct, OPP 12.01. (*Id.*). Specifically, they found that Jiang "continue[d] to argue with management and staff" and "sometimes uses an elevated tone." (*Id.*). Jiang also "attempted to reinitiate debates on policies" and "fail[ed] to consistently follow reasonable

5

instructions." (*Id.*). They concluded that this conduct violated OPP 12.01. (*Id.* at 392). Wilson agreed with Peters' recommendation and issued a notice of intent to discharge to Jiang on April 29. (Apr. 29 Memo, Dkt. 16-2, at 321–22).

On May 11, Jiang filed an internal complaint alleging race and age discrimination. (*See* Mot. Summ. J., Dkt. 16, at 12). The ARC investigated Jiang's discrimination claim and concluded that he had not been discriminated against. (*See id.*). Wilson then fired Jiang, he appealed her decision, and the head of TCEQ upheld Wilson's decision. (*See id.*).

## IV. DISCUSSION

### *A. Title VII and TCHRA Discrimination*

Because Jiang attempts to prove race- and national origin-based discrimination under Title VII through circumstantial evidence, the Court must evaluate his claims under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by the Fifth Circuit. *Paske v. Fitzgerald*, 785 F.3d 977, 984 (5th Cir. 2015).[3] "Under the modified *McDonnell Douglas* approach, the plaintiff must first demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that either (1) the employer's reason is a pretext or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411–12 (5th Cir. 2007).

---

[3] The TCHRA was "modeled after federal civil rights law" and has as an express purpose to provide for the execution of the policies of Title VII. *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999). The TCHRA "purports to correlate state law with federal law in the area of discrimination in employment," so Texas courts "look to analogous federal precedent for guidance when interpreting" the TCHRA. *Id.* (citations and quotation marks omitted). Accordingly, the Court will analyze Jiang's Title VII and TCHRA race-discrimination claims under the same standards.

6

To establish his prima facie case, Jiang must show that he "(1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside of the protected class, or, in the case of disparate treatment, shows that other similarly situated employees were treated more favorably." *Standley v. Rogers*, 680 F. App'x 326, 327 (5th Cir. 2017) (quoting *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004)).

Defendants don't dispute that Jiang has satisfied the first three elements of his prima facie case; they argue only that Jiang cannot identify any similarly situated employees who were treated more favorably. (Mot. Summ. J., Dkt. 16, at 15–17). However, Jiang's claim does not require proof of disparate treatment because he has produced evidence that he was replaced by a non-Chinese employee. (Resp. Mot. Summ. J., Dkt. 19, at 17). The Court agrees that Jiang has stated a prima facie case.

On the other hand, Jiang does not dispute that Defendants have met their burden to articulate a legitimate, non-discriminatory reason for the decision to fire Jiang. (*See* Mot. Summ. J., Dkt. 16, at 17–18 (arguing that Jiang was fired for violating TCEQ's professional conduct policy, which requires that employees exercise good judgment, behave professionally, and provide excellent customer service)). The question in this case is whether Jiang can offer sufficient evidence to create a genuine issue of material fact either that (1) TCEQ's stated reason is a pretext or (2) that its reason, while true, is only one reason for firing Jiang in addition to his race or national origin. *See Burrell*, 482 F.3d at 412. For the purposes of avoiding summary judgment, Jiang argues that TCEQ's stated reason is a pretext.

At the pretext stage of the burden-shifting analysis, Jiang can survive summary judgment by showing that "the totality of the evidence, including the evidence raised at the prima facie case and pretext stages, raises a genuine issue of material fact" as to whether Defendants fired him because of his race. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999). "Pretext may be

shown by any evidence which demonstrates the employer's proffered reason is false." *Burrell*, 482 F.3d at 412 n.11. Evidence relevant to pretext must be evaluated in light of the ultimate question: "whether the employer intentionally discriminated." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 146 (2000). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* at 147. However, an employer might be entitled to summary judgment "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* at 148.

Jiang has met his burden to establish a genuine issue of material fact as to whether TCEQ fired him because of his race. First, Jiang has produced evidence from which a reasonable jury might infer that TCEQ's bases for placing him on probation—which relate to his eventual termination—were untrue. *See supra* at 4–5. Second, Jiang states that he was treated differently than other employees because of his race. (*See* Jiang Decl., Dkt. 19-2 at 2; Jiang Dep., Dkt. 16-2, at 67–68 (stating that management had a "double standard" for him and for white employees, such as directing junior employees not to talk to him, having junior white employees review his work, or being less lenient about his punctuality)). Third, other employees corroborate Jiang's allegations of differential treatment. (*See* Mughal Dep., Dkt. 16-3, at 171–75 (stating that he believed Jiang was discriminated against on the basis of race and discussing specific examples of differential treatment, such as speaking to him rudely); Mughal Decl., Dkt. 19-3, at 66 (same); Gable Interview Notes, Dkt. 19-3, at 11 (stating that management "targeted" Jiang for discriminatory reasons)).[4] Fourth, other TCEQ employees dispute the bases for Jiang's termination. (*See* Mughal Decl., Dkt. 19-3, at 66–68

---

[4] TCEQ's own internal investigation of the four discrimination complaints made by SWAT employees provides partial support for Jiang's position. On one hand, the investigation found that performance standards were not being applied consistently in Jiang's division. (Applegate Dep., Dkt. 19-2, at 122). On the other, the investigation also concluded that the inconsistent application was not based on race. (*Id.* at 122–23).

(stating that Jiang was not rude to coworkers, did not raise his voice, or disrupt SWAT by debating policies)). Fifth, despite evidence that Jiang had debated multiple policy decisions with TCEQ management since at least as far back as 2008, (*see* Mot. Summ. J., Dkt. 16, at 4–6), he was never formally disciplined—and there is no evidence that his conduct was unprofessional or disruptive—until Wilson took over SWAT in December 2015. A reasonable jury could conclude from this evidence that Defendants' stated reasons for terminating Jiang are untrue and that the decision to fire him was in fact motivated by his race.

Defendants argue that Jiang fails to raise a genuine fact issue for several reasons. First, they argue that Jiang's denials of TCEQ's asserted bases for firing him are not competent summary judgment evidence. (Mot. Summ. J., Dkt. 16, at 18). While it is true that an "employee's subjective belief that he was discriminated against, standing alone, is not adequate evidence to survive a motion for summary judgment," *Raina v. Veneman*, 152 F. App'x 348, 350 (5th Cir. 2005), Jiang's belief does not stand alone.[5] His position is supported by the observations and conclusions of at least two of his coworkers and by the lack of disciplinary action against him over a long career. *See supra* at 8–9.

Defendants also argue that the evidence provided by Jiang's coworkers is "extraordinarily weak," (Reply, Dkt. 20, at 2), and that Jiang's termination was supported by strong and consistent evidence of a legitimate purpose, (Mot. Summ. J., Dkt. 16, at 18–19). This argument is a request that the Court weigh the evidence, something normally prohibited at this stage but implicitly permitted by *Reeves*'s contemplation of granting judgment to an employer in cases where a plaintiff created only a weak issue of fact regarding pretext and there was abundant uncontroverted evidence that no discrimination had occurred. *Reeves*, 530 U.S. at 148. The Fifth Circuit has repeatedly cautioned that

---

[5] TCEQ asks the Court to disregard the statements made by Jiang's coworkers on the same grounds. (Reply, Dkt. 20, at 2–3 (citing *Eugene v. Rumsfeld*, 168 F. Supp. 2d 655, 679 (S.D. Tex. 2001) ("[T]he subjective belief of a fellow employee, whether a supervisor or coworker, suffers from the same defects as the plaintiff's subjective belief."))). The Court declines to do so. It is not merely Jiang's coworkers' subjective beliefs in evidence; they provide the bases for their beliefs as well. (*See* Mughal Dep.., Dkt. 16-3, at 172 (stating that TCEQ management spoke rudely to Jiang and "don't listen to him")).

9

such cases will be rare. *Burrell*, 482 F.3d at 415; *Laxton v. Gap Inc.*, 333 F.3d 572, 585 (5th Cir. 2003); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 223 (5th Cir. 2000). This is not the rare case in which *Reeves*'s exception to the usual prohibition against weighing the evidence at summary judgment applies. Even crediting the strength of the Defendants' evidence, the Court finds neither that Defendants' evidence is uncontroverted nor that Jiang's evidence is so weak that no reasonable jury could find in Jiang's favor.

Finally, Defendants argue that Jiang has only presented evidence relevant to some of the reasons he was given for his termination but has not disputed other bases. (*See* Reply, Dkt. 20, at 5 ("Dr. Jiang was not terminated for speaking at an elevated volume. He was terminated for unprofessional conduct in violation of TCEQ's OPP 12.01.")). Even so, the Court is required to believe Jiang's evidence and draw all justifiable inferences in his favor. *Anderson*, 477 U.S. at 255. A reasonable jury could conclude that Defendants were not being truthful about some of their stated reasons for terminating Jiang, infer from that conclusion that the other stated reasons are also untrue, and then further infer from the totality of the evidence that the true reason was discriminatory. Defendants are not entitled to summary judgment on Jiang's Title VII and TCHRA race discrimination claims.

*B. Title VII and TCHRA Retaliation*

To establish a Title VII or TCHRA retaliation claim,[6] a plaintiff must show that "(1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action." *Zamora v. City Of Houston*, 798 F.3d 326, 331 (5th Cir. 2015). To show a causal connection, the plaintiff must prove that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw.*

---

[6] Again, because Texas state courts look to federal law to interpret the TCHRA, *NME Hosps.*, 994 S.W.2d at 144, the Court will analyze Jiang's Title VII and TCHRA retaliation claims under the same standards.

*Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "A retaliation claim that is premised on a pretextual rationale for dismissal is analyzed under the *McDonnell Douglas* framework." *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013). Because Jiang's retaliation claim relies on a pretext argument, the Court must analyze it under the *McDonnell Douglas* framework.

There is no dispute that Jiang has engaged in a protected activity when he complained of race discrimination in August 2015 and on April 21, 2016.[7] *See Rodriquez v. Wal–Mart Stores, Inc.*, 540 F. App'x. 322, 328 (5th Cir. 2013) ("An employee that files an internal complaint of discrimination engages in a protected activity.") (citing *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 194 (5th Cir. 2001)). There is also no dispute that being placed on probation and being terminated were adverse employment actions. The only question regarding Jiang's prima facie case is whether he has satisfied the causation prong.

To establish the causation element of his prima facie case, a plaintiff "must present either direct evidence of retaliation or circumstantial evidence creating a rebuttable presumption of retaliation." *Washburn v. Harvey*, 504 F.3d 505, 510 (5th Cir. 2007) (citation and quotation marks omitted). "Close timing between an employee's protected activity and an adverse action against [the employee] may provide the causal connection required to make out a prima facie case of retaliation." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (citation and quotation marks omitted). A plaintiff can satisfy his prima facie burden solely on the basis of timing by showing an interval between the protected activity and the adverse action from as little as five days, *id.*, to as long as two

---

[7] In his complaint, Jiang alleges that he "was repeatedly disciplined for his complaints and ultimately terminated because of them." (Orig. Pet., Dkt. 1-4, at 13). The Court interprets Jiang's complaint to state causes of action for Title VII and TCHRA retaliation for adverse employment actions taken following each of his discrimination complaints. Although Jiang's complaint on April 21, 2016 was made informally during a progress meeting, the Court finds that informal complaints are protected activities under Title VII. *See Brandon v. Sage Corp.*, 61 F. Supp. 3d 632, 649 (W.D. Tex. 2014), *aff'd*, 808 F.3d 266 (5th Cir. 2015) (holding that "informal opposition to a discriminatory practice can constitute protected activity" after observing that "the majority of circuits find that informal complaints" are protected activities under Title VII); *Williams v. Racetrac Petroleum, Inc.*, 824 F. Supp. 2d 723, 726 (M.D. La. 2010) ("An employee's informal complaint to an employer may constitute participation in a protected activity, provided that the complaint is in opposition to conduct that is unlawful and the employee holds a good faith, reasonable belief of the conduct's unlawfulness.").

and a half months, *Richard v. Cingular Wireless LLC*, 233 F. App'x 334, 338 (5th Cir. 2007); an interval of four months, however, is too long. *Flanner v. Chase Inv. Servs. Corp.*, 600 F. App'x 914, 922 (5th Cir. 2015); *Barkley v. Singing River Elec. Power Ass'n*, 433 F. App'x 254, 260 (5th Cir. 2011).

Timing alone satisfies Jiang's burden to make a prima facie showing of causation for his retaliation claim arising out of his termination, which was recommended the day after he complained of race discrimination in his April 21 meeting and adopted by Wilson a week later. More is required for his claim arising out of his placement on probation, which occurred almost four months after his discrimination complaint on August 21, 2015. (Jiang Decl., Dkt. 19-2, at 3). But there is sufficient evidence to satisfy Jiang's prima facie burden with respect to that complaint, as well. On October 27, 2015, another SWAT employee, Grant Gibson, told Wilson he was being discriminated against on the basis of his age. (Nov. 6 Memo, Dkt. 16-2, at 191). Wilson placed him on disciplinary probation two weeks later. (Nov. 13 Memo, Dkt. 19-3, at 54). Another SWAT employee, Kathy Buckley, told Hamilton on October 27, 2015, that she felt she was being discriminated against on the basis of her age. (Nov. 6 Memo, Dkt. 16-2, at 191). Hamilton drafted a performance improvement plan for Buckley within a month of Buckley's complaint, (Buckley Draft PIP, Dkt. 19-3, at 57), but Buckley transferred out of SWAT before the plan could take effect. (*See* Resp. Mot. Summ. J., Dkt. 19, at 9).[8] In June 2017, SWAT employee Fayyaz Mughal told Peters that he believed that he was subject to discrimination on the basis of age and race. (Mughal email, Dkt. 19-3, at 70). Peters placed Mughal on a performance improvement plan in November 2017. (Mughal PIP, Dkt. 19-3, at 71). Viewed collectively, a reasonable jury could view these incidents as a pattern of complaint-based retaliation by SWAT's management personnel, which would be circumstantial evidence of retaliatory intent against Jiang. Additionally, there is evidence from which a reasonable jury could conclude that TCEQ's stated reasons for placing Jiang on probation were untrue, *see supra* at 4–5, from which they

---

[8] Another TCEQ employee stated in an email that Hamilton had an "unwarranted negative attitude" towards Buckley. (Betz email, Dkt. 19-3, at 63).

could further infer that Wilson placed Jiang on probation in retaliation for filing a discrimination complaint. Taken together, this evidence is sufficient circumstantial evidence to satisfy Jiang's prima facie burden to establish causation.

As with Jiang's race-discrimination claim, there is no question that Defendants have met their burden to articulate a legitimate, non-discriminatory reason for the decision to fire Jiang. *See supra* at 7. Accordingly, "summary judgment is appropriate" unless Jiang can raise a genuine issue of material fact regarding whether TCEQ's "rationale is pretextual." *Shackelford*, 190 F.3d at 408. In resolving that issue, the Court is mindful of the ultimate question: "whether the evidence of retaliation, in its totality, supports an inference of retaliation." *Id.* at 407.

Jiang has provided enough evidence to survive summary judgment. "The combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment." *Id.* at 409 (reversing summary judgment granted in favor of the employer where the employee was fired on the same day she performed a protected activity, rebutted the employer's stated reason for termination, and provided corroborating evidence from coworkers). The timing of Jiang's termination could be viewed as suspicious—Peters drafted her recommendation to fire Jiang the day after he complained of race discrimination on April 21.[9] Moreover, the April 21 meeting agenda suggests that Jiang's supervisors were not planning to fire him for performance reasons as of the conclusion of that meeting. The agenda indicates that Jiang was told that he "needs to demonstrate improvement, that TCEQ was "hopeful that [Jiang's] attention to this matter will cause immediate correction," and that Jiang's "failure to address" the concerns raised in the meeting "would result in further disciplinary action, including discharge." (Apr. 21 Meeting Agenda, Dkt. 16-

---

[9] Defendants argue that the relevant conduct is not Peters' April 22 draft but Wilson's May 25 notice of discharge, since Wilson was the ultimate decisionmaker. (Reply, Dkt. 20, at 7). First, Wilson provided a notice of discharge to Jiang on April 29. (*See* Mot. Summ. J., Dkt. 16, at 12). Second, both one week and one month are tight enough temporal intervals to be probative of retaliatory intent under Fifth Circuit precedent. *See Evans*, 246 F.3d at 354; *Richard*, 233 F. App'x at 338. Defendants' factual dispute on this point is irrelevant.

13

2, at 217). Even TCEQ's human resources director admits that it is "unusual" to "indicate that [the supervisor] is giving additional time for correction" and then to recommend the employee's termination the next day. (Applegate Corp. Dep., Dkt. 19-3, at 2; *see also id.* at 6 (admitting that the timing of Peters' April 22 termination recommendation draft "could substantiate a retaliation claim")).

On top of that evidence, there is the evidence rebutting Defendants' stated reasons for placing Jiang on probation and ultimately firing him. *See supra* at 4–5, 8. Finally, there is the lack of evidence that Jiang was formally disciplined in his more than 20 years at TCEQ before he filed his discrimination complaint in August 2015. *See Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 43 (5th Cir. 1992) ("[P]rior to [the plaintiff's] discharge she had never been placed on probation, and not suspended until after she had filed her EEOC complaint—her performance evaluations indicate no such problem. . . . We find it surprising that suddenly, after [the plaintiff] filed her EEOC complaint, problems with her work surfaced."). As it was in *Shackelford*, there exists in this case evidence that "could cast some doubt on [the employer's] proffered rationale . . . combined with both the suspicious timing of [the plaintiff's] termination in tight proximity to [his] protected activity and the other evidence of pretext." *Shackelford*, 190 F.3d at 409. And as in *Shackelford*, "[t]he totality of this evidence is sufficient to support the inference" that TCEQ did not actually fire Jiang for its stated reasons, "but instead terminated [him] in retaliation for [his] protected activity." *Id.* Summary judgment is inappropriate with respect to Jiang's federal- and state-law retaliation claims.

*C. 42 U.S.C. § 1981*

42 U.S.C. § 1981 ("Section 1981") provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts." 42 U.S.C. § 1981(a). "Make and enforce contracts" is defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and

14

conditions of the contractual relationship." *Id.* § 1981(b). To establish a Section 1981 claim for contractual discrimination, a plaintiff must prove that: (1) he is a member of a racial minority; (2) the defendants intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute—here, terminating an employment contract. *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017). "The analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims." *Id.*

Section 1981 claims against a state or state agency are barred by the Eleventh Amendment. *Moore v. Univ. Mississippi Med. Ctr.*, 719 F. App'x 381, 388 (5th Cir. 2018); *Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1069 (5th Cir. Unit A 1981). Section 1981 does not provide a cause of action against state actors in their official capacity. *Oden v. Oktibbeha Cty., Miss.*, 246 F.3d 458, 462 (5th Cir. 2001). Accordingly, Jiang can state a Section 1981 claim only against Wilson in her individual capacity, and "[c]laims against individual public officials under § 1981 are subject to the defense of qualified immunity." *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 338 (5th Cir. 2003).

Jiang has produced evidence from which a reasonable jury could find each element of a Section 1981 claim. Because Section 1981 claims are analyzed in the same manner as Title VII claims, summary judgment is inappropriate for Jiang's Section 1981 claim against for the same reason that it is inappropriate for his Title VII race discrimination claim, *see supra* at 6–10, unless Wilson is entitled to qualified immunity.

Public officials are entitled to qualified immunity when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury show the [public official's] conduct violated a federal right." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (citation, quotation marks, and

alterations omitted). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1166 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Court should not define the clearly established law in question too generally; the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). The "salient question" under the second prong "is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan*, 134 S. Ct. at 1866 (citation and quotation marks omitted).

Wilson argues that she is entitled to qualified immunity because Jiang "cannot show that it was objectively unreasonable for Wilson to terminate his employment under these facts (i.e. his ongoing conduct issues and failure to follow reasonable instructions from supervisors)." (Mot. Summ. J., Dkt. 16, at 29). Wilson believes she is entitled to qualified immunity based on the facts as viewed in the light most favorable to her. (*See* Reply, Dkt. 20, at 9–10 ("She allowed Dr. Jiang's April 29 discrimination complaint to proceed through the proper TCEQ channels and waited until a decision was rendered before moving forward with the termination. Any reasonable official in her position would have acted similarly.")). The Court cannot conduct that analysis: "under either prong [of the qualified immunity analysis], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866. It would be error to "define a case's 'context' in a manner that imports genuinely disputed factual propositions" or to fail to view the evidence in the light most favorable to Jiang. *Id.* The question is whether Wilson is entitled to qualified immunity based on the evidence as viewed in the light most favorable to Jiang. Viewed in that light, Wilson fired Jiang on the basis of his race. "The right to be free from racial discrimination . . . is clearly established under [Section 1981]." *Gallentine v. Hous. Auth. of City of Port Arthur, Tex.*, 919 F. Supp. 2d 787, 814 (E.D. Tex. 2013) (citing *CBOCS West, Inc.*, 553 U.S. 442, 446 (2008); *Southard v.*

*Tex. Bd. of Crim. Justice*, 114 F.3d 539, 550 (5th Cir. 1997); *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997); *Garner v. Giarrusso*, 571 F.2d 1330, 1338 (5th Cir. 1978)). Wilson is not entitled to qualified immunity at this stage in the litigation. Summary judgment is inappropriate for Jiang's Section 1981 claim against Wilson for the same reasons it is inappropriate for his Title VII race discrimination claim against Defendants.

## IV. CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment, (Dkt. 16), is **DENIED**.

**SIGNED** on August 13, 2018.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE